*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

V

RICHARD ANTHONY FRANCIS ALI,

        Defendant-Appellant.

UNPUBLISHED
March 18, 2021

No. 344887
Wayne Circuit Court
LC No. 17-010939-01-FC

Before: SWARTZLE, P.J., and MARKEY and TUKEL, JJ.

PER CURIAM.

Defendant appeals by right his jury trial convictions of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1), and assault with intent to commit criminal sexual conduct involving sexual penetration, MCL 750.520g(1). Defendant was initially sentenced as a second-offense habitual offender, MCL 769.10, to concurrent sentences of 10 to 20 years' imprisonment for the CSC-I conviction and 5 to 15 years' imprisonment for the assault conviction. But after our Supreme Court's decision in *People v Beck*, 504 Mich 605; 939 NW2d 213 (2019), the trial court modified the CSC-I sentence and imposed a reduced sentence of 6 to 20 years' imprisonment because it had previously relied on acquitted conduct in scoring one of the offense variables. The sentence for the assault conviction remained unchanged. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of defendant's sexual assault of the victim, JB. Defendant and JB knew each other by virtue of a relationship between JB's sister and defendant's uncle. On the night of the assault, defendant's uncle and JB's sister had a vow-renewal ceremony at which JB was a bridesmaid and defendant was a groomsman. According to JB, defendant was "really drunk" at the ceremony and reception. Although JB claimed that she did not consume any alcohol, other attendees testified to the contrary.

When the ceremony ended, JB drove defendant and a friend to the home of JB's mother. Also present in the vehicle was JB's three-year-old daughter. On the way to the home, defendant repeatedly kissed JB's hand. The group first stopped at a liquor store and then proceeded to JB's mother's home, where they sat in the living room talking and drinking, although JB did not

consume any alcohol. JB sat on a small couch and defendant sat next to her. He started touching her, and, at some point, "sucked [her] toes." Everyone told defendant to stop.

Later, JB got up to use the bathroom. Defendant followed, entered the bathroom, and tried to close the door. JB's mother, however, pushed the door open, grabbed defendant's arm, pulled him out of the bathroom, and directed him back to the living room. Although other vow-renewal attendees arrived at the house, JB eventually decided that she wanted to go home with her daughter. After getting her daughter ready to leave, JB went outside and saw defendant sitting in her vehicle. Although she tried to coax and force defendant out of the car, both by herself and with the help of others, she was unsuccessful. Eventually, JB climbed into her car and drove defendant home.

When JB pulled into defendant's driveway, she told him to get out of her vehicle. Defendant stated that he was not going to exit and declared, in vulgar terms, that he had been waiting nearly ten years to have sex with JB. Defendant pulled JB's leggings down and inserted his fingers into her vagina. JB pushed defendant away and begged him to leave her car. Instead, defendant got on his knees in the passenger seat and used his forearm to push JB against the driver's side window. JB testified that defendant proceeded to hit her in the face, choke her, hold her down, and pull his pants down. JB claimed that defendant then rubbed his penis against JB's vagina and inserted "[j]ust the tip" of his penis into her vagina. But on cross-examination JB indicated that defendant's penis had not entered her vagina. JB struggled with defendant and tried to push him away. Eventually, defendant stopped trying to penetrate JB's vagina and exited her vehicle. JB immediately left defendant's house, called her mother, and tried to find a nearby police station without success. The following day JB went to the Highland Park Police Station and reported the sexual assault to police.

The jury found defendant guilty of CSC-I for the digital-vaginal penetration and of assault with intent to commit criminal sexual conduct involving sexual penetration. The jury found defendant not guilty of a CSC-I charge that alleged penile-vaginal penetration and not guilty of assault by strangulation, MCL 750.84.

## II. UNSIGNED FELONY INFORMATION

On appeal, defendant first argues that the prosecution's failure to file a *signed* felony information requires us to vacate his convictions because the failure to abide by statutory and court-rule mandates regarding the filing of a felony information divested the trial court of jurisdiction to continue the case. We disagree. MCL 767.76 provides, in relevant part, as follows:

> No indictment shall be quashed, set aside or dismissed or motion to quash be sustained or any motion for delay of sentence for the purpose of review be granted, nor shall any conviction be set aside or reversed on account of any defect in form or substance of the indictment, unless the objection to such indictment, specifically stating the defect claimed, be made prior to the commencement of the trial or at such time thereafter as the court shall in its discretion permit.

Although MCL 767.76 references indictments and not informations, Michigan law regarding indictments applies equally to informations. See MCL 767.2 ("All provisions of the law applying

to prosecution upon indictments . . . shall, in the same manner and to the same extent as near as may be, be applied to informations and all prosecutions and proceedings thereon.").

Defendant did not object to the prosecution's failure to sign the information before the trial began or after it ended. Indeed, defendant did not even raise the issue until he filed his motion for new trial. Accordingly, under MCL 767.76, the defect in the information's form—the lack of a signature—cannot be the basis to set aside or reverse defendant's convictions, jurisdictionally or otherwise. The failure to satisfy the objection prerequisite of MCL 767.76 precludes reversal; it does not trigger plain-error analysis for forfeited error, see *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).[1] If that were the case and plain-error review necessitated reversal, the clear and unambiguous language of MCL 767.76 would be offended. Moreover, before defendant's trial, the prosecutor filed an amended information that was signed. Additionally, the record is overflowing with documentation and proof that defendant was fully aware of the charges against him before trial commenced, and defendant presents no viable argument that jurisdiction was lost because the original information was not signed. Reversal is unwarranted.

## III. LIMITING THE SCOPE OF EVIDENTIARY HEARING

Defendant next argues that the trial court erred by limiting the scope of the *Ginther*[2] hearing to the issue of whether defense counsel was ineffective for failing to raise the unsigned-information issue. Defendant asserts that the evidentiary hearing should also have addressed whether defense counsel was ineffective for failing to effectively cross-examine JB. We disagree.

The decision whether to grant an evidentiary hearing on a claim of ineffective assistance of counsel is reviewed for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008). In *People v Ginther*, 390 Mich 436, 443-444; 212 NW2d 922 (1973), our Supreme Court observed:

> A defendant who wishes to advance claims that depend on matters not of record can properly be required to seek at the trial court level an evidentiary hearing

---

[1] An analogy can be made to MCR 6.310(D), which requires a defendant to move to withdraw a plea in the trial court before challenging the plea on appeal. In *People v Baham*, 321 Mich App 228, 235; 909 NW2d 836 (2017), this Court, construing MCR 6.310(D), observed:

> Defendant's challenge to the factual basis for his plea implicates the accuracy of his plea, and thus his claim falls squarely within the ambit of MCR 6.310(D). Because a motion to withdraw a plea constitutes a prerequisite for challenging the accuracy of a plea and defendant has not filed such a motion, our direct substantive review of this appellate argument is precluded under MCR 6.310(D).

The Court did not apply plain-error analysis; rather, it honored the plain language of MCR 6.310(D).

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

for the purpose of establishing his claims with evidence as a precondition to invoking the processes of the appellate courts except in the rare case where the record manifestly shows that the judge would refuse a hearing; in such a case the defendant should seek on appeal, not a reversal of his conviction, but an order directing the trial court to conduct the needed hearing.

In his affidavit submitted with his motion for new trial, defendant asserted that trial counsel had "no strategy whatsoever but instead for lack of a better word freestyled his defense in my case." Defendant averred that rather than using questions that defendant came up with after he reviewed JB's statements, defense counsel "ruffle[d] up some questions on the spot[.]" According to defendant, counsel's questions "had no depth or strength to raise any doubt in [JB's] testimony." Moreover, defendant stated that defense counsel was concerned only with money and did not take "time out for his client," and that if he had, counsel "could have brought forth all the lies and inconsistencies" and secured a different verdict. Defendant also contended that if defense counsel had used JB's words against her, it would have "exposed [her] for the liar she is[.]" Defendant set forth several examples of questions that defense counsel could have asked to attack JB's credibility at trial.

At trial, defense counsel lodged multiple objections to hearsay and speculative testimony. When cross-examining JB, defense counsel challenged some of her testimony by pointing out that certain claims she made at trial had not been made either to the police when she was interviewed or during JB's preliminary-examination testimony. Defense counsel also challenged JB's story in terms of how the sexual assault occurred given the cramped confines of her "very small" vehicle. Moreover, defense counsel sought to undermine JB's assertions that defendant hit her in the face and choked her, querying whether she had bruises and eliciting testimony by JB that she did not have any bruises. Defense counsel additionally explored the question whether there was any damage to the interior of JB's vehicle after the assault.

Defense counsel further questioned JB regarding the layout of her mother's home, whether defendant was being flirtatious with her, and whether she could have moved from her seat on the couch. Counsel also challenged JB's testimony concerning conversations that she had at her mother's home. Defense counsel questioned JB in regard to any efforts to lay on the horn—she did not do so—or to other measures that could have been taken inside the car to alert others. Moreover, counsel grilled JB with respect to whether she consumed alcohol throughout the evening. Defense counsel questioned JB whether defendant's penis actually entered her vagina, to which she responded, "No." Overall, counsel through his cross-examination made an effort to call into question almost every aspect of JB's version of events.

While there might be some stylistic differences from how defendant framed matters in his affidavit, the questions, the subject-matter, and the purported shortcomings in JB's testimony that defendant wished to explore and ask trial counsel about at the *Ginther* hearing were mostly covered by counsel at the trial. Indeed, they were matters of record. Accordingly, there was no need for the *Ginther* hearing to encompass the issue of counsel's cross-examination of JB. We also note that defense counsel obtained acquittals on one of the CSC-I charges (penile-vaginal penetration) and on the charge of assault by strangulation, thereby belying any claim that counsel's examination of JB had to be further scrutinized at the *Ginther* hearing. Finally, to the extent that defendant is attempting to slip in a claim of ineffective assistance of counsel, we conclude that defense

-4-

counsel's performance in cross-examining JB was not deficient, *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001), as it did not fall below an objective standard of reasonableness, *People v Toma*, 462 Mich 281, 302; 613 NW2d 694 (2000). Defense counsel's cross-examination of JB was thorough, extensive, aggressive, and exposed some inconsistencies in her story, presumably resulting in two not-guilty verdicts.

## IV. PROSECUTORIAL MISCONDUCT

Defendant next argues that the prosecution improperly vouched for the credibility of its witnesses during closing argument and improperly elicited testimony from a detective regarding defendant's probationary status. With respect to the latter argument, defendant further contends that the trial court erred by denying his associated motion for a mistrial. Defense counsel failed to object to the alleged instances of improper vouching, and unpreserved issues are reviewed for plain error affecting substantial rights. *Carines*, 460 Mich at 763-764. In *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007), this Court explained the principles regarding prosecutorial misconduct:

> Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial. A defendant's opportunity for a fair trial can be jeopardized when the prosecutor interjects issues broader than the defendant's guilt or innocence. Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context. The propriety of a prosecutor's remarks depends on all the facts of the case. A prosecutor's comments are to be evaluated in light of defense arguments and the relationship the comments bear to the evidence admitted at trial. [Quotation marks and citations omitted.]

A prosecutor may not vouch for the credibility of a witness by implying that he or she has some special knowledge that the witness is testifying truthfully. *Id.* at 66. A prosecutor is, however, permitted to argue from the facts and testimony that a witness is credible or worthy of belief. *Id.*

Defendant asserts that the prosecutor improperly vouched for JB's credibility, implying that she had some special knowledge of JB's truthfulness when she indicated that JB did not have a motive to lie. Defendant takes issue with the following remarks the prosecutor made during her closing argument:

> So let's go back to motive to lie. Motive to lie. [JB] testified she's known [defendant] for approximately roughly seven years ever since [defendant's] uncle has been married to [JB's] biological sister. And she told you she never had a problem with him. They've always had this caddy relationship where he touches her, she pops him, in her words, like, a toddler. She hits his hand, don't do that, don't do that. She never expected this to occur. She's never had an issue with him. Defendant's witness, . . . the victim's sister, even testified that at the wedding reception she didn't notice any bad vibes, any grudges, everybody was having a good time. So as far as motive to l[i]e I would submit to you guys [that JB] has none. [JB] has no motive to lie. I would submit to you that [JB] didn't just wake up

-5-

one day and say, hey, how can I ruin [defendant's] life. I submit to you, ladies and gentlemen, she did not do that because she has no motive to lie.

In context, the prosecutor was not suggesting that she had some special knowledge that JB was telling the truth, and it was not improper for the prosecutor to argue that JB had no motive to lie based on the evidence of the surrounding circumstances. See *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004) ("In fact, the prosecutor made no comments at all about his personal knowledge or belief regarding the truthfulness of the police witnesses; he merely argued that the officers had no reason to lie.").

Defendant also challenges the prosecutor's remarks that two police officers had no motive to lie. On review of the record, as was the case with respect to JB, we conclude the prosecutor was not suggesting that she had some special knowledge of the truthfulness of the officers' testimony; rather, the prosecutor was merely indicating that under the facts presented at trial, the officers had no reason to lie. *Id.*

Defendant further argues that the prosecution improperly elicited prior-bad-acts testimony from a detective who referenced the fact that defendant was on felony probation. After the detective testified that he sent patrol cars to defendant's house and that defendant was not arrested at the time, the prosecutor asked the detective what he did "in regards to the investigation[.]" In response, the detective stated that he contacted "the 30th District Court Administrator and had [defendant's] felony probation that he was on violated—[.]" Defense counsel objected, and the jury was excused. Once the jury was out of the courtroom, defense counsel requested a mistrial, arguing that the detective "had no reason whatsoever to divulge to this jury that my client was on any type of probation let alone felony probation." The trial court denied the motion for mistrial, but stated that it would "instruct the jury to . . . disregard the detective's statement about the defendant's status at the time of this inquiry."

After a short break, defense counsel expanded his argument for a mistrial. Counsel maintained that the prosecutor elicited the detective's answer and that there was "no curative instruction that will un-ring that bell." Defense counsel asserted that the reference that defendant was on felony probation was highly prejudicial. Counsel's argument prompted the trial court to take another recess to perform its own research on the issue. After reviewing several cases from this Court, the trial court exercised its discretion and denied the motion for mistrial. But the trial court noted that it would still instruct the jury to disregard the detective's response.

Once the jury was brought back to the courtroom, the trial court provided the following curative instruction:

> Ladies and gentlemen, I'm going to instruct you to disregard the statement that [the] [d]etective . . . made about the defendant's status at the time of the initial investigation in this case. You are to completely disregard it and in no way is it to be interpreted by you in any way to be used to determine the guilt or innocence of the defendant. I'm specifically instructing you to disregard that statement.

The record demonstrates that the prosecutor did not intentionally elicit the reference to defendant's probationary status. "An unresponsive answer to a proper question is not usually

error." *People v Measles*, 59 Mich App 641, 643; 230 NW2d 10 (1975). "A prosecutor's good-faith effort to admit evidence does not constitute misconduct." *Dobek*, 274 Mich App at 70. "As a general rule, unresponsive testimony by a prosecution witness does not justify a mistrial unless the prosecutor knew in advance that the witness would give the unresponsive testimony or the prosecutor conspired with or encouraged the witness to give that testimony." *People v Hackney*, 183 Mich App 516, 531; 455 NW2d 358 (1990). This Court examines unresponsive remarks from police officers with greater scrutiny. *People v Holly*, 129 Mich App 405, 415; 341 NW2d 823 (1983). Police officers have a "special obligation not to venture into . . . forbidden areas." *Id.*

Everything in the record indicates that the prosecutor acted in good faith and was simply trying to elicit information about the steps the detective took to investigate JB's allegations. There was certainly nothing in the record to suggest that the prosecutor knew in advance that the detective would give the unresponsive answer or that the prosecutor conspired with or encouraged the detective to so testify. Defendant has not established prosecutorial misconduct.

Moreover, to be granted a mistrial, the moving party must demonstrate that the "error complained of is so egregious that the prejudicial effect can be removed in no other way." *People v Gonzales*, 193 Mich App 263, 266; 483 NW2d 458 (1992). A mistrial is justified only if the jury was exposed to extraneous influences that "created a real and substantial possibility that they could have affected the jury's verdict." *People v Budzyn*, 456 Mich 77, 88-89; 566 NW2d 229 (1997). "References to a defendant's prior incarceration are, unless specifically ruled otherwise, generally inadmissible." *People v Spencer*, 130 Mich App 527, 537; 343 NW2d 607 (1983). "The danger . . . is that a jury will misuse prior conviction evidence by focusing on the defendant's general bad character, rather than solely on his character for truthtelling." *People v Allen*, 429 Mich 558, 569; 420 NW2d 499 (1988). "A mistrial should be granted only for an irregularity that is prejudicial to the rights of the defendant, and impairs his ability to get a fair trial[.]" *People v Haywood*, 209 Mich App 217, 228; 530 NW2d 497 (1995) (citations omitted). Generally, "an unresponsive, volunteered answer to a proper question is not grounds for the granting of a mistrial." *Id.*

Although the detective's response was plainly improper, it did not result in the denial of a fair trial and did not require the granting of a mistrial. The testimony did not describe the nature of defendant's prior offense, and defense counsel's immediate objection quickly interrupted the detective's unresponsive and volunteered testimony. Additionally, the trial court, without repeating the response, strongly instructed the jury to disregard the detective's response. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). In sum, defendant has failed to demonstrate that the trial court's instruction did not cure any error that arose from the detective's brief and isolated mention of defendant's probationary status. See *People v Pickens*, 446 Mich 298, 314; 521 NW2d 797 (1994) (stating that the law requires a fair trial, not a perfect one). We cannot conclude that the challenged testimony created a real and substantial possibility that it affected the jury's verdict, particularly in light of the jury's not guilty verdicts as to two of the charges. For these reasons, we hold that the trial court did not abuse its discretion by denying defendant's motion for mistrial. *People v Dickinson*, 321 Mich App 1, 18; 909 NW2d 24 (2017).

## V. JUDICIAL BIAS AND MISCONDUCT

Defendant finally argues that the trial court pierced the veil of impartiality with several of its actions and comments. We disagree. In *People v Biddles*, 316 Mich App 148, 151-152; 896 NW2d 461 (2016), this Court observed:

> The question whether judicial misconduct denied defendant a fair trial is a question of constitutional law that this Court reviews de novo. A defendant must overcome a heavy presumption of judicial impartiality when claiming judicial bias. To determine whether the trial judge's conduct deprived defendant of a fair trial, we consider whether the trial judge's conduct pierced the veil of judicial impartiality. A judge's conduct pierces this veil and violates the constitutional guarantee of a fair trial when, considering the totality of the circumstances, it is reasonably likely that the judge's conduct improperly influenced the jury by creating the appearance of advocacy or partiality against a party. This is a fact-specific inquiry, and we must consider the cumulative effect of any errors. A single instance of misconduct generally does not result in the appearance that a trial judge is biased, unless the instance is so egregious that it pierces the veil of impartiality. To evaluate the totality of the circumstances, we consider a variety of factors, including the nature of the judicial conduct, the tone and demeanor of the trial judge, the scope of the judicial conduct in the context of the length and complexity of the trial and issues therein, the extent to which the judge's conduct was directed at one side more than the other, and the presence of any curative instructions. [Quotation marks, citations, and alteration brackets omitted.]

"The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." MRE 611(a).

First, defendant challenges the trial court's comment to defendant's brother regarding the inappropriateness of smirking and snorting at the prosecutor during examination. Subsequently, after a recess and before the jury was brought back into the courtroom, defense counsel raised an issue regarding the trial court's remarks directed at defendant's brother and the court's failure to similarly reprimand JB when she left the courtroom. Defendant argued that JB's conduct of "storming out of the courtroom" was prejudicial to him, especially when the trial court had "already spoken to [JB] in reference to her not having any facial expressions or nodding her head or anything during the testimony."[3] Defendant asked for a curative instruction in respect to JB's conduct or an admonishment of JB "telling her again not to do anything in front of this jury that might be prejudicial to" him. Defendant indicated that the trial court had no issue reprimanding defendant's brother when he smirked and snorted at the prosecutor, so defendant requested the same treatment relative to JB's conduct.

---

[3] We note that the court's comments to JB belie defendant's position that the court was biased against him.

With respect to JB's leaving the courtroom, the trial court disagreed with defendant's characterization of her exit. Instead, the trial court believed that JB left the courtroom quickly and quietly, and her doing so was preferable to remaining in the courtroom if she was becoming visibly upset. We conclude that the trial court was in a far superior position to characterize JB's exit from the courtroom as compared to this panel, and there is nothing in the record providing us with a reason to question the court's characterization. See MCR 2.613(C). Defendant has failed to demonstrate that the trial court's failure to admonish JB any further was either improper, revealed bias, prejudiced him in the eyes of the jurors, or pierced the veil of judicial impartiality.

Regarding the trial court's admonishment of defendant's brother for snorting and smirking at the prosecutor, the trial court stated:

> Now, as to the witness, [defendant's brother], [the prosecutor] tagged him on a piece of testimony and I heard . . . a snort and I saw him sort of smirk and shake his head at her and I will not tolerate that kind of disrespect to an officer of the court. And it is my duty as the judge under MCR 2.513(B) to control the proceedings during the trial and that's what I did. And . . . [the] demeanor [of defendant's brother] towards [the prosecutor was inappropriate] and after I admonished him he stopped. So I think I am fully within my responsibility as the person in control of this courtroom to advise the witness that he will not speak or act disrespectfully toward an officer of this Court.

In response, defense counsel took issue with the trial court's admonishment of defendant's brother in front of the jury, indicating that it should have excused the jury before doing so.

There is no merit to defendant's argument. There was nothing improper about admonishing defendant's brother and doing so in front of the jury. And we suspect that had the jurors, who obviously witnessed the brother's conduct, been excused immediately after it transpired, they would have realized that defendant's brother was about to be scolded by the court. Regardless, the trial court had the absolute right to demand respectful conduct in the courtroom, and defendant has not demonstrated that the court's exercise of discipline revealed bias against defendant or pierced the veil of judicial impartiality. At face value, the court's chastisement of defendant's brother merely showed to the jury that the court would not tolerate disrespectful behavior. It did not demonstrate prejudice or bias against defendant, nor would have any reasonable juror so construed it.

Defendant also challenges the trial court's admonishment of defendant's uncle, arguing that the court's criticism of a witness's answers in front of the jury as nonresponsive, despite the answers being responsive, prejudiced defendant. Throughout the questioning of defendant's uncle, the trial court noted the nonresponsive nature of his answers and repeatedly instructed him to listen to the prosecutor's question and answer what was asked. When defendant's uncle continued to give nonresponsive answers, the trial court excused the jury, instructed defendant's uncle that he was to answer the prosecutor's questions and advised that if it had "to tell [him] this one more time we're going to have a discussion about . . . criminal contempt of Court; do you understand?" Defendant's uncle indicated that he understood, and after the jury returned to the courtroom, he finally started to answer the questions being asked.

The trial court's direction to defendant's uncle that he answer the prosecution's specific questions came within the court's duty to control the presentation of evidence. The prosecutor asked simple yes-or-no questions regarding whether defendant's uncle wanted JB to go to the police and press charges. When he repeatedly failed to answer the questions and provided evasive, nonresponsive answers, the trial court repeatedly instructed him to answer the questions. This was well within the trial court's duty to control the presentation of evidence in its goal to assist in ascertaining the truth and avoiding the needless consumption of time. MRE 611(a).

Moreover, the trial court instructed the jury that its "comments, rulings, questions, and instructions are . . . not evidence." The trial court stated that it was its "duty to see that the trial [was] conducted according to the law and to tell you the law that applies to this case; however, when I make a comment or give an instruction I am not trying to influence your vote or express a personal opinion about the case." Further, the trial court instructed, "If you believe that I have an opinion about how you should judge this case you must pay no attention to that opinion. You are the only judges of the facts and you should decide this case from the evidence." "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Abraham*, 256 Mich App at 279.

There was nothing improper about the trial court's characterizations, comments, and admonishments on any of the matters raised by defendant; therefore, we reject defendant's contention that the combination and accumulation of errors denied him a fair trial. See *Dobek*, 274 Mich App at 106 ("Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal.").

We affirm.


/s/ Brock A. Swartzle
/s/ Jane E. Markey
/s/ Jonathan Tukel

-10-